## APPEAL OF PIEDMONT-MT. AIRY GUANO CO.

Docket No. 1757.    Submitted July 17, 1925.    Decided March 10, 1926.

Use and occupancy is a property right inhering in the ownership of physical property and as such is the subject of insurance. When such physical property is destroyed by fire, that portion of the proceeds of use and occupancy insurance which is immediately used in replacing such property in a condition fit for use and occupancy may be deducted from the gain derived by such insurance, under the provisions of section 234 (a) (14) of the Revenue Act of 1921.

*Theodore B. Benson, Esq.*, for the taxpayer.
*Robert A. Littleton, Esq.*, for the Commissioner.

Before JAMES, LITTLETON, SMITH, and TRUSSELL.

This is an appeal from the determination of deficiencies in income and profits taxes for 1917 and 1918 of $1,590.96 and $22,580.44, respectively.

### FINDINGS OF FACT.

The taxpayer is a Maryland corporation, with its principal office at 707 Keyser Building, Baltimore. Its business is that of manufacturing fertilizer.

On September 28, 1917, the taxpayer's plant, with the exception of one small building, which, standing alone, was of no productive value, was destroyed by fire. The taxpayer received $81,875.33 as fire insurance on its building and machinery. It also received $50,000 as use and occupancy insurance. Of the amount received, as use and occupancy insurance, $19,000 was paid to the taxpayer in 1917 and $31,000 in 1918.

The property on which the plant of the taxpayer was located consisted of $1\frac{88}{100}$ acres. At the time the property was acquired there was only one small building covering a part of the ground. Additions were made from time to time, until the plant covered practically all the property. These additions were made during the dull season by labor regularly employed by the taxpayer in its business, and the amounts expended on such construction were charged on the books of the taxpayer to expense.

At the outbreak of the World War in 1914, the officials of the taxpayer, believing that the risk incurred in the operation of its business had become much greater, sought to increase the fire insurance on the plant. Being unable to procure what they deemed to be sufficient fire insurance on the buildings and machinery, they took out 12 policies of insurance of $5,000 each on the use and occupancy of the plant. This insurance was taken out in September, 1914, and was renewed from year to year, being in effect at the time of the fire in 1917. The policies were written on the ordinary fire insurance forms, with riders attached setting forth the special provisions of the contracts. These riders read in part as follows:

On the use and occupancy of their buildings and other structures and additions, situate on Porter Street, South side of Baltimore Harbor, Locust Point, Baltimore, Md., and occupied for the manufacture and storage of fertilizer and fertilizer materials with permission to do such work and use, keep and carry such articles, materials and supplies as may be incidental to the use and business of assured.

The conditions of this contract of insurance applying to use and occupancy are—that if the buildings herein described or any part thereof or machinery or equipment or any part thereof shall be destroyed or entirely disabled by fire and/or lightning during the term of this policy so as to entirely prevent operating or carrying on of the business at the above described location or if the said buildings or machinery or equipment or any part thereof shall be so damaged or disabled as to prevent the full use and occupancy of said premises, then this Company shall be liable for its pro rata part of the loss sustained by reason of such total or partial prevention not exceeding its pro rata share of $200 per day in case of total prevention and propor

tionately for partial prevention for each working day (excluding Sundays and holidays) not exceeding in either case, the amount insured; and for the purposes of this insurance it is assumed that the average daily value of the use and occupancy of the said premises to the said assured is and hereby beforehand to be $200 for each working day as above described. Loss if any, to be computed from the day of the occurrence of any fire to the time when said buildings, machinery or equipments therein could, with ordinary diligence be repaired or rebuilt ready for use and not to be limited to the date of expiration named in this policy and settlement shall be made without reference to or contribution with or from insurance covering any other kinds of insurable interests.

Provided, however, that the Insurance Companies shall under no circumstances be liable for a greater amount than $60,000 in any one year. It is stipulated and agreed as a part of this contract that the assured shall maintain a total insurance of $60,000 or become a co-insurer for the difference.

      \*       \*       \*       \*       \*       \*       \*

LIGHTNING AND DYNAMO CLAUSES FOR USE AND OCCUPANCY INSURANCE.

This policy also covers direct loss or damage to the use and occupancy hereby insured caused by lightning, (meaning thereby the commonly accepted use of the term lightning, and in no case to include loss or damage by cyclone, tornado or windstorm) not exceeding the sum insured, nor the interest of the insured in the property, and subject in all other respects to the terms and conditions of this policy. Provided, however, if there shall be any other use and occupancy insurance on said property; this Company shall be liable only pro rata with such other insurance for any direct loss by lightning, whether such other insurance be against direct loss by lightning or not.

This policy does not cover loss of earnings due to stoppage of dynamos, motors, or any other apparatus for generating, utilizing regulating or distributing electricity, caused by any defect or break in the insulation or machine or by excess current, whether artificial or natural, or by lightning.

Immediately after the fire the taxpayer set about rebuilding its plant. The new plant, which was completed on or about July 1, 1918, was of the same construction as the old plant, but had a smaller tonnage capacity. The original buildings were two-story structures, whereas the new building had only one story. The $50,000 received under the policy of use and occupancy insurance was paid at the rate of $200 per day for the period required to replace the plant. This amount, together with the amount recovered as fire insurance on buildings and machinery, was used in building the new plant, which cost $189,890.03. The difference between replacement cost and the amount received as insurance, including both fire and use and occupancy insurance, was $58,014.70.

At the time of the fire in 1917 the plant and machinery of the taxpayer was carried on its books at a value of $85,213.71.

In determining the tax liability of the taxpayer for the years 1917 and 1918 the Commissioner has treated the amounts received in those years as use and occupancy insurance as profits and not as insurance covering loss of property. Notice of the determination

from which this appeal was taken was mailed by the Commissioner on December 2, 1924, and the appeal was filed on January 30, 1925.

OPINION.

TRUSSELL: The only question involved in this appeal is whether or not the amount received by the taxpayer under a policy of insurance on the use and occupancy of its plant, or any part of such amount, is taxable gain. It is contended by the Commissioner that the insurance in question was insurance against loss of profits and should be included in gross income in full, while the taxpayer contends that, although the insurance was carried as use and occupancy insurance, it was in fact nothing more than additional fire insurance on the plant, and that no taxable gain resulted.

That gain derived under a policy of insurance against the loss of a building by fire should enter into the computation of the gain or loss resulting therefrom may not be doubted, for, if the destruction of a taxpayer's property results in a gain by him through insurance, there is a taxable gain growing out of the ownership or use or interest in real or personal property. Under section 234 (a) (14) of the Revenue Act of 1921, however, relief is provided in the form of a deduction for taxpayers who expend the proceeds from such an involuntary conversion of property in replacing it with similar property.

Section 234 (a) (14) reads as follows:

If property is compulsorily or involuntarily converted into cash or its equivalent as a result of (A) its destruction in whole or in part, (B) theft or seizure, or (C) an exercise of the power of requisition or condemnation, or the threat or imminence thereof; and if the taxpayer proceeds forthwith in good faith, under regulations prescribed by the Commissioner with the approval of the Secretary, to expend the proceeds of such conversion in the acquisition of other property of a character similar or related in service or use to the property so converted, or in the acquisition of 80 per centum or more of the stock or shares of a corporation owning such other property, or in the establishment of a replacement fund, then there shall be allowed as a deduction such portion of the gain derived as the portion of the proceeds so expended bears to the entire proceeds. The provisions of this paragraph prescribing the conditions under which a deduction may be taken in respect of the proceeds or gains derived from the compulsory or involuntary conversion of property into cash or its equivalent, shall apply so far as may be practicable to the exemption or exclusion of such proceeds or gains from gross income under *prior* income, war-profits and excess-profits tax Acts.

This provision applies only where "property is compulsory or involuntarily converted into cash or its equivalent" and the "proceeds of such conversion" are expended in the acquisition of "property of a character similar or related in service or use." In the instant case the taxpayer received $81,875.33 under its fire insurance policy and

$50,000 as use and occupancy insurance, making a total of $131,875.33. This amount and $58,014.70 additional was expended in rebuilding the plant. Accordingly, if the total amount of $131,875.33 constituted the proceeds from the conversion of the property replaced at a cost of $189,890.03, the deduction allowable under the provision quoted above is equal to the amount of any taxable gain derived, and the determination of the Commissioner should be disallowed. With reference to the amount received as fire insurance there is no question, but it is contended that the amount received as use and occupancy insurance has no other relation to the property destroyed than that of ordinary profits to property used in business. It will be necessary, therefore, to determine whether or not the amount so received constituted proceeds from an involuntary conversion of the taxpayer's property.

Use and occupancy insurance is of modern origin, and there is little information to be found with reference to the risk that is covered. The Commissioner states that it is insurance against loss of profits, while the taxpayer contends that it is insurance against loss of property. One of the first cases decided by the courts involving insurance of this character was *Michael* v. *Prussian National Insurance Co.*, 171 N. Y. 25; 63 N. E. 810. In that case the court said:

"Use and occupancy," as terms of insurance, may assume, within their general scope, the expectation of profits and earnings derivable from property; but the terms appear to have a broader significance as to the subject of insurance, and to apply to the status of the property, and to its continued availability to the owner for any purpose he may be able to devote it to. The defendant might have avoided all questions of construction, and have made plain the subject of its insurance, if it was the business of the plaintiff, or its earnings and profits, by the use of appropriate and unmistakable words. But such words occur nowhere. The defendant has chosen to make a contract of insurance which distinguishes its subject as something other than the buildings or machinery, and which can mean the earnings and profits only by resort to reasoning. The terms made use of have not the accepted significance contended for by the appellant, and any doubt or ambiguity should be resolved against it and in favor of the assured. *Janneck* v. *Insurance Co.*, 162 N. Y. 574, 57 N. E. 182; *Matthews* v. *Insurance Co.*, 154 N. Y. 456, 48 N. E. 751, 39 L. R. A. 433, 61 Am. St. Rep. 627. Insurance "on use and occupancy" evidently relates to the business use which the property is capable of in its existing condition. If it is destroyed by fire, and its use becomes impossible, then during the period required for its reinstatement as property capable of use and occupation the owner is to be compensated according to the terms of the policy. The more reasonable meaning of this contract, in my opinion, appears to be that it is a provision for indemnity to the owner of the elevator plant in the event that it should not continue in the same condition of availability to him, at a valuation agreed upon for every day required to reinstate it. The owner had an interest in its continued status as property capable of being used and occupied, and the defendant received its premium upon the basis of an agreement as to the estimated daily value to the assured of such a status.

In *Tanenbaum* v. *Freundlich*, 39 Misc. 819; 81 N. Y. S. 292, the court, adopting the definition of "use and occupancy" insurance, as laid down in *Michael* v. *Prussian National Insurance Co.*, *supra*, stated:

> The profits of the business were quite another insurable risk, and not at all covered by the phrase "use and occupancy" * * *.

See also *Tanenbaum* v. *Simon*, 40 Misc. 174; 81 N. Y. S. 655; and *Jacksonville Oil Mills* v. *Stuyvesant Insurance Co.*, 3 Fed. (2d) 1006, where the court stated:

> The thing insured was not the possibility of profit or loss, nor profits which might have been earned, but that which was insured by defendants was the right of plaintiff to the use and enjoyment of its property; in other words, it was the privilege which plaintiff desired to have to use its property, the right to endeavor to earn profits. That right or privilege was insured, regardless of whether such right or privilege might or might not have been remunerative. Plaintiff did not obtain insurance against the possibility of its winning or losing in the operation of its property. If such had been its intention, it would doubtless have had the policy so worded as that it would have covered a loss, whether the property had been destroyed or not. An insurance against loss of profits would be a totally different contract from insurance guaranteeing the right to the use and enjoyment of property. Furthermore, the great difficulty of endeavoring to arrive at any reasonable basis whereby possible profits of a business such as that in which plaintiff was engaged might have been estimated for any particular period is manifest. In the policies in question no such uncertainty was contemplated, nor is such possibility embraced within the contracts.

Since it appears that the subject matter of use and occupancy insurance is the availability of such property to the owner for any purpose he may be able to devote it to, it is now necessary to determine whether or not this right of use and occupancy is an integral part of the property destroyed. If so, it comes within the provision of section 234 (a) (14), and any gain that may have resulted to the taxpayer from its destruction is offset by a deduction of the same amount, in view of the fact that the property was immediately replaced and the total amount received from the involuntary conversion of the property was expended in its replacement. In the case of *Drainage Commissioners of District No. 8* v. *Knox*, 237 Ill. 148; 86 N. E. 636, the court said:

> Property need not be taken in the literal sense in order to entitle the owner to compensation for property taken, and, in fact, the right acquired is ordinarily a mere easement. The owner has the same amount of land as before, but the easement acquired for the public use is a material and permanent interruption in the use of the land, which is the taking of property. Property in land is the right of user and disposition and dominion to the exclusion of others, and that is the sense in which it is used in the Constitution.

In *Chicago & W. I. R. Co.* v. *Englewood Connecting Ry. Co.*, 115 Ill. 375; 4 N. E. 246, the court made the following statement:

\* \* \* for property itself, in a legal sense is nothing more than the "exclusive right of possessing, enjoying, and disposing of a thing," which, of course, includes the use of a thing.

See also *In re Hong Wah*, 82 Fed. 623; *Vann v. Edwards*, 135 N. C. 661; 47 S. E. 784; and *Jaynes v. Omaha Street Ry. Co.*, 53 Nebr. 631; 74 N. W. 67.

From the above it appears that the use of a certain object or thing belonging to a person is an indispensable part of that individual's property in the object or thing. If the material object is destroyed the use is destroyed, and the property loss to the owner includes both the loss of the material object and its use. We are of the opinion, therefore, that even though the taxpayer's right to the use and occupancy of its plant was for the purpose of insurance taken separately from the physical plant itself and made a distinct object of insurance, it was nevertheless insurance of the taxpayer's property in that plant, and proceeds received under the policy of insurance on the use and occupancy of such plant were proceeds from the involuntary conversion of the property as contemplated by section 234 (a) (14) of the Revenue Act of 1921; and, furthermore, just as the subject matter of the insurance was destroyed by destruction of the physical plant, so was it restored when the plant was rebuilt and again made available for use and occupancy by the taxpayer. Since the property was replaced at a cost greater than the amount of the proceeds from the involuntary conversion of the property, the receipt of the insurance on the use and occupancy of the plant does not affect the tax liability of the taxpayer for the years 1917 and 1918.

In the *Appeal of The International Boiler Works Co.*, 3 B. T. A. 283, we had a somewhat similar question before us. There we held that the proceeds from a policy of insurance designated as use and occupancy insurance were not proceeds from the conversion of property, and that the provisions of section 234 (a) (14) of the Revenue Act of 1921 did not apply. In that appeal, however, the facts were substantially different from the facts in the instant appeal. The language of the policy there involved left no doubt as to subject matter by stating that, in the event the property was destroyed or damaged by fire, the company should be liable for the "actual loss sustained of net profits on the business, which is thereby prevented," whereas the policy now before us contains no such provisions, and the only reference therein to loss of profits is a provision expressly excepting loss of earnings due to stoppage of motors, dynamos, etc., from the operation of the policy. The policy covers insurance "on the use and occupancy" of buildings and other structures used in the business of the taxpayer, and provides for liability if the plant or a part

104881—27——68

thereof is destroyed so as to prevent the carrying on of business or damaged so as to prevent " the full use and occupancy of said premises." Furthermore, the indemnity is fixed by the policy, which states that " for the purposes of this insurance it is assumed that the average daily value of. the use and occupancy of the said premises to the said assured is and hereby beforehand to be $200." This language is fundamentally different from the language of the policy involved in the *Appeal of The International Boiler Works Co.*, *supra*, and clearly comes within the line of cases cited above. If it had been the intention of the parties to include profits within the terms of the policy, they could easily have done so.

*Order of redetermination will be entered on 15 days' notice, under Rule 50.*