### APPEAL OF COTTON CONCENTRATION CO.

Docket No. 4625.   Submitted December 15, 1925.   Decided June 21, 1926.

1. Where expenditures were made, partly for a new roof and partly for an old roof, *held*, that only the amount which can be identified as having been expended for repairs may be deducted.

2. In determining gain or loss on conversion of capital assets, due allowance must be made for depreciation.

3. Where the taxpayer owned two buildings, one of which was entirely destroyed and the other partly destroyed by fire, and only one was reconstructed, of larger size and at greater cost than the amount of insurance received to cover damage to both, *held*, that any gain realized from the insurance is offset by the deduction permitted under section 234(a)(14) of the Revenue Act of 1921.

*Morris D. Kopple, Esq.*, for the petitioner.
*L. C. Mitchell, Esq.*, for the Commissioner.

Before GRAUPNER,[1] TRAMMELL, and PHILLIPS.

This is an appeal from the determination of a deficiency in income and profits taxes in the amount of $1,826.13 for the calendar year 1920 and an overassessment of $74.27 for the year 1921, a net deficiency of $1,751.86. The questions for determination are whether the Commissioner erred in determining (1) that the taxpayer realized a profit from insurance received following the destruction of buildings by fire, (2) that a profit had been realized by deducting depreciation from the cost of the buildings, and (3) in disallowing a claimed deduction of the cost of repairing a roof on one of the buildings occupied by the taxpayer.

### FINDINGS OF FACT.

The taxpayer is a Texas corporation with its principal office at Galveston, and is engaged in the storage of cotton and merchandise.

In 1920 the taxpayer owned and occupied two sheds, which it had constructed on land owned by the Galveston Wharf Co. The right of occupation of the land was acquired by lease dated July 31, 1918, under which the taxpayer agreed, as a part of the rent, to reimburse the Galveston Wharf Co. for a specified percentage of the taxes and assessments on the land and improvements, and, as the balance of the rent, to pay a sum equal to its entire net profits in excess of $5,000 for each year ending August 31.

The sheds owned and occupied by the taxpayer were designated, respectively, as the " east shed " and the " west shed."

In 1919 the taxpayer engaged a roofer to replace a part and to repair a part of the roof of the west shed. Two payments on account of this work were made in 1919 and are not involved in this appeal. The final payment in the amount of $1,922.25 was made by the taxpayer on February 14, 1920.

The east shed was 110 feet wide and the west 120 feet. They were each about 700 feet in length, and consisted in the main of wooden posts supporting a roof covered with prepared paper roofing. They were separated by two railroad tracks with the necessary space between tracks to allow passage for cars, and a gangway of six feet, making a total distance of 31 feet between the sheds. They were joined at one end by an embankment or berm of mud shell filling, which was used at times as a passageway to hand-truck bales of cotton from cars to the sheds. The east shed had a capacity of about 6,000 bales of cotton and the west, about 7,000 bales.

The two sheds were at all times operated as a unit, under the direction of one superintendent. The cost of both sheds and of

---

[1] This decision was prepared by Mr. Graupner during his term of office.

subsequent repairs and improvements was carried in one account on the taxpayer's books and designated "Plant."

The total cost of both sheds, exclusive of the cost of mud shell filling, was $30,950.57. The cost of the east shed was $14,802.42, and the cost of the west shed was $16,148.15.

No depreciation on the sheds was ever entered on the taxpayer's books.

They were insured under policies covering both sheds.

On September 30, 1920, a fire occurred which entirely destroyed the west shed, 56.25 per cent of the east shed, and mud shell filling of the cost of $4,582.37. The depreciated value of the east shed at that date was $11,265.17, and that of the west shed was $12,289.32. The depreciated cost of that part of the property destroyed was $18,625.98. Insurance on the sheds in the amount of $34,681.42 was received by the taxpayer in July, 1921. Of this amount $22,848.12 was properly assignable to the destruction of the west shed, and the balance, $11,833.30, to the partial destruction of the east shed. No insurance was received for the destruction of the mud shell filling.

The taxpayer did not rebuild the west shed but did reconstruct and enlarge the east shed, completing it in 1921, at a cost of $39,733.33. This reconstructed shed was improved by the addition of fire walls, galvanized iron sides, walls four feet higher, and by raising the floor, and was enlarged by the addition of 10 feet to the width and 20 feet to the length and by increasing the height so as to permit double-decking the bales of cotton. Thus enlarged, its storage capacity was slightly greater than the combined capacity of the two sheds had been before the fire.

The Commissioner determined that the taxpayer had realized a profit from the insurance applicable to the west shed, by the following method of computation:

| | | |
|---|---:|---:|
| Insurance applicable to west shed | | $22,848.12 |
| Cost of west shed (52.174 per cent of combined area) | $16,148.15 | |
| Less depreciation March 1, 1913, to September 30, 1920 | 3,858.83 | |
| Depreciated cost | 12,289.32 | |
| Loss from washed-out fill not compensated for by insurance | 4,582.37 | |
| | | 16,871.69 |
| Taxable gain | | 5,976.43 |

OPINION.

GRAUPNER: Counsel for both parties call our attention to the provisions of the lease as being determinative of the improvements and

repairs which the taxpayer was required to make and of the expenditures which it was permitted to deduct in determining the net earnings payable to the lessor under its lease. These net earnings, as pointed out by the Commissioner, are obviously not the same as net income upon which the taxpayer's liability to tax is based. We are not determining here the net earnings or profits of the taxpayer upon which the rental to be paid the lessor was to be based. Consequently, we are not concerned with the improvements and expenditures therefor provided for under the lease. These are purely matters for adjustment between the parties to the lease. The evidence is clear that on February 14, 1920, the taxpayer paid a roofer the sum of $1,922.25, and our concern is to determine whether this amount is deductible from gross income as an ordinary and necessary expense or whether it should be capitalized. The Commissioner refused to allow a deduction of this expenditure, contending that it was made for the construction of a new roof and was accordingly a capital item. The testimony of the man employed to perform the labor is that he "put on shell and gravel roofing" and that "a portion of that roof was entirely gone and I put a new roof on it." While the testimony is also to the effect that, in addition to the construction of a new roof, some repairs were made to a part of the old roof which was on the shed, apparently no separation was made between the cost of the new roofing and the repairs. The determination of the Commissioner with respect to the expenditure of $1,922.25 is accordingly approved insofar as it applies to the cost of the new roof. *Appeal of Simmons & Hammond Manufacturing Co.*, 1 B. T. A. 803; *Appeal of Salo Auerbach*, 2 B. T. A. 67. If any portion of the amount paid can be allocated to repair work alone, it may be allowed as a deduction.

The taxpayer also contends that if the cost of replacing and repairing the roof is not deductible as an ordinary and necessary expense, then, under its contract, the amount expended becomes payable to the lessor as additional rent. That the term "rentals" does not include payments made for improvements has been settled by the Supreme Court in *Duffy* v. *Central R. R. Co.*, 268 U. S. 55; 45 Sup. Ct. 429; 5 Am. Fed. Tax Rep. 5377.

The Commissioner's method of computation in determining that a profit was realized from insurance received is set forth in the findings of fact above. The taxpayer objects to the deduction of depreciation from March 1, 1913, value of the sheds, as no depreciation was entered on its books, and contends that an adjustment for depreciation would necessitate an adjustment of rent for past years between it and the lessor.

With respect to the first of these objections, the Board has held in the *Appeal of Even Realty Co.*, 1 B. T. A. 355, that in determining gain or loss, due allowance must be made for depreciation, whether or not deductions therefor had been taken by the taxpayer in prior years. There appears to be no objection on the part of the taxpayer to either the basis or rate used by the Commissioner in determining the amount of the depreciation if the Board finds that allowance therefor should be made. As to the contention that such an allowance would require a recomputation of rent between the lessor and lessee, we repeat what we said above with respect to the roofing expenditures—that that is a matter for adjustment between the parties to the lease and does not concern us in adjusting the items in dispute between the taxpayer and the Commissioner.

The amount of $18,625.98, set forth in the findings of fact as depreciated cost of that part of the property destroyed, was arrived at on the basis of the total destruction of the west shed and 56.25 per cent destruction of the east shed. The amount of the insurance received allocated in the findings to the sheds separately was found on the basis that the depreciated cost of the west shed was 65.88 per cent of the total amount of the destruction. In other words, 65.88 per cent of the insurance received, amounting to $22,848.12, is the amount to be allocated to the west shed which was totally destroyed, leaving the balance, $11,833.30, to cover the partial destruction of the east shed. There is no dispute between the taxpayer and the Commissioner as to these figures.

The Commissioner determined that a gain had been realized from the insurance received, as set forth above, on the theory that the two sheds were separate units in the taxpayer's business and that in rebuilding and enlarging the east shed the insurance received was used only in the replacement of one unit of the business, leaving a profit realized on the insurance on the west shed.

The sheds were both used for the same purpose—the storage of baled cotton. After the cars in which the cotton was shipped for storage were placed on the tracks between the sheds, the bales were removed and stored in the sheds. At times cotton was taken from cars on the west track and stored in the east shed and from cars on the east track and stored in the west shed. This was done when there were cars on both tracks by bridging through the cars, and when only one track was loaded with cars the cotton was taken by truck across the passageway, or berm, which connected the buildings at the north end. Both sheds were carried on the taxpayer's books under one account. From these facts we draw the conclusion

that the two sheds must be considered as constituting a single unit in the taxpayer's business.

Section 234(a) (14) of the Revenue Act of 1921, which is made expressly applicable to prior years, permits the deduction from gross income of gains derived through the involuntary conversion of property when the proceeds are used to acquire " other property of a character similar or related in service or use to the property so converted." Under the Commissioner's interpretation of this section, it would be necessary for a taxpayer in order to receive the benefit of it, to reconstruct destroyed property in exactly the same physical condition as the original property. This is not in accordance with the plain terms of the Act, quoted above and repeated here for emphasis, which refer to " other property of a *character similar or related in service or use* to the property so converted." (Italics ours.)

In the *Appeal of Piedmont-Mt. Airy Guano Co.*, 3 B. T. A. 1009, the facts were that the taxpayer used the proceeds of use and occupancy insurance to replace the physical property destroyed. We held in that appeal that, under section 234(a) (14), when physical property is destroyed by fire, that portion of the proceeds of use and occupancy insurance which is used to replace such property may be deducted from the gain derived from such insurance.

Considering the facts in the present appeal, we find that the reconstructed east shed, when completed, occupied a slightly larger area than did the former east shed, and, by increasing its height to allow double-decking the bales of cotton, its storage capacity was slightly more than the combined capacity of the two sheds destroyed. The capacity of the shed as thus increased permitted the taxpayer to care for the volume of business which had formerly required the facilities of two sheds. The improvements added, such as fire walls and galvanized iron sides, were made to meet conditions prescribed by the underwriters. It is evident from this, we believe, that the reconstructed east shed constituted a replacement of the two destroyed and was sufficiently related in service or use to the former sheds to come within the provisions of section 234(a) (14). As this shed was reconstructed at a cost greater than the amount of the insurance received on the destruction of the two, any gain that the taxpayer may have derived from the insurance is offset by the deduction permitted by section 234(a) (14), and the determination of the Commissioner that a taxable gain was realized from the insurance is disallowed.

> *Order of redetermination will be entered on 15 days' notice, under Rule 50.*